UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

RICKEY PAUL MURRAY,

            Petitioner,

     v.

J. LOZANO,

         Respondent.

Case No.  20-cv-00471-HSG

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OFAPPEALABILITY**

     Before the Court is the petition for a writ of habeas corpus of Petitioner Rickey Paul Murray, brought pursuant to 28 U.S.C. § 2254, challenging the validity of his state court conviction.  (Dkt. No. 1.)  Respondent has filed an answer to the petition (Dkt. No. 16), and Petitioner has filed a traverse (Dkt No.19).  For the reasons set forth below, the petition is DENIED.

## I.     PROCEDURAL HISTORY

     In 2017, a Monterey County jury convicted Petitioner of possession of a firearm by a felon (Cal. Pen. Code § 29800(a)(1)), possession of ammunition by a felon (Cal. Pen. Code § 30305 (a)(1)), possession of cocaine for sale (Cal. Health & Saf. Code § 11351), possession of heroin for sale (Cal. Health & Saf. Code § 11351), possession of methamphetamine for sale (Cal. Health & Saf. Code § 11378), three counts of possession of a controlled substance while armed with a firearm (Cal. Health & Saf. Code § 11370.1(a)); assault with a semiautomatic firearm (Cal. Pen. Code § 245 (b)), shooting at an inhabited dwelling (Cal. Pen. Code § 246), shooting at an unoccupied vehicle (Cal. Pen. Code § 247(b)) and discharging a firearm with gross negligence (Cal. Pen. Code § 246.3(a)).  *See People v. Murray*, No. H046866, 2019 WL 5387923, at *1 (Cal. Ct. App. Oct. 22, 2019).  The jury also found true allegations that Petitioner was armed with a

United States District Court
Northern District of California

firearm (Cal. Pen. Code § 12022(c)) in the commission of the three counts involving possession for sale of narcotics, and that Petitioner personally used a firearm (Cal. Pen. Code § 12022.5(a)) in the commission of the assault, shooting, and firearm discharge counts. *Id.* The trial court sentenced Petitioner to 15 years and 8 months in prison. (Dkt. No. 16-3 at 142-53, 191.)

Petitioner appealed his conviction to the California Court of Appeal. On October 15, 2018, the California Court of Appeal affirmed the judgment of conviction, but remanded for the trial court to consider whether to strike or impose the firearm enhancement. *People v. Murray*, No. H044508, 2018 WL 4959898, at *1 (Cal. Ct. App. Oct. 15, 2018). On January 16, 2019, the California Supreme Court summarily denied review. (Dkt. No. 16-14 at 215.) On remand, the trial court declined to strike the firearm enhancement, and the California Court of Appeal dismissed the appeal. *Murray*, 2018 WL 4959898.

Petitioner filed a habeas petition with the California Supreme Court, which was summarily denied on March 11, 2020. (Dkt. No. 16-14.)

On January 22, 2020, Petitioner filed a federal habeas petition that commenced the instant action. (Dkt. No. 1.)

## II.   STATEMENT OF FACTS

The following factual background is taken from the October 5, 2018 opinion of the California Court of Appeal.[1]

> On September 30, 2017, defendant was involved in a shooting at a hotel in Salinas. After the shooting, a search of defendant's hotel room revealed he was in possession of cocaine, methamphetamine, and heroin. At trial, defendant claimed that he shot in self-defense and that he possessed the narcotics for personal use.
>
> **A. The Shooting**
>
> At about 10:15 p.m. on September 30, 2017, Salinas Police officers responded to a report of shots fired at a hotel on North Main Street. The hotel was known for drug trafficking and for being frequented by people with guns.

---

[1] The Court has independently reviewed the record as required by AEDPA. *Nasby v. Daniel*, 853 F.3d 1049, 1052-54 (9th Cir. 2017). Based on the Court's independent review, the Court finds that it can reasonably conclude that the state court's summary of the facts is supported by the record, and that this summary is therefore entitled to a presumption of correctness, unless otherwise indicated in this order.

United States District Court
Northern District of California

United States District Court
Northern District of California

Officers located a bullet fragment next to a parked car, and they observed a bullet strike on the hood of the car. There were also bullet strikes on the hood of an SUV parked next to the car. Officers found bullet strikes on the motel exterior, including the office area. They found a bullet jacket and a fired bullet in the parking lot, along with a .380-caliber shell casing.

Surveillance video showed some males kicking and knocking on hotel doors at about 10:10 p.m. [FN] At about 10:12 p.m., a male wearing a gray shirt and white pants walked past the hotel office. A few minutes later, a Honda Accord drove into the hotel parking lot. There were at least two people in the Accord: the driver and a front seat passenger.

About 20 seconds after the Accord parked, defendant walked past the Accord. Defendant looked inside the Accord. In response to a gesture by the Accord driver, defendant put his hands up with his palms forward. Defendant then ran to a hotel room. Defendant went inside the hotel room for a few seconds, and then exited, carrying a gun behind his back.

Meanwhile, the male in the gray shirt walked up to the Accord and began speaking to the passenger and driver. The passenger and driver got out of the Accord, and the driver pulled out a gun from his waistband.

Defendant walked back from the hotel room towards the Accord, still holding the gun behind his back. When he neared the Accord, he took a "shooting stance" and exchanged gunfire with the driver; both men were crouched on opposite sides of a parked car. [FN 1] The male in the gray shirt and the passenger were crouched behind another car; neither was shooting.

> [FN 1] At trial, an officer who had reviewed the surveillance video testified that it appeared that the Accord driver fired first, but only after defendant pointed his firearm at the Accord driver.

After the shooting, the male in the gray shirt and the passenger walked away, and the Accord driver drove away. Defendant ran back into the hotel room. The police arrived and used a bullhorn to order defendant to exit the hotel room. After about 15 minutes, defendant and Christina Hampton came out of the hotel room. Defendant and Hampton were both arrested.

When interviewed by the police, defendant denied having participated in the shooting, despite the police telling him that there was surveillance video. Defendant never claimed to have acted in self-defense, even after an officer suggested that defendant might have shot "for protection" after the "other guys" shot at him first.

**B. Search of the Hotel Room**

Officers obtained a search warrant for defendant's hotel room. They found a loaded handgun concealed in a bag of cat food. The

3

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

handgun's serial number had been removed.

Inside of a refrigerator, officers found two plastic baggies of suspected heroin on top of a plastic Tupperware container. The combined weight of the two baggies of heroin was 8.8 grams. Inside of a dresser drawer, officers found another Tupperware container, which held four baggies of methamphetamine, two baggies of cocaine, and a baggie of heroin. One baggie contained 12 bindles of methamphetamine with a combined weight of 7.7 grams. A second baggie contained 15.1 grams of methamphetamine crystals. A third baggie contained 21.3 grams of "large shards" of methamphetamine. A fourth baggie contained 24 bindles of methamphetamine with a combined weight of 4.8 grams. A fifth baggie contained four bindles of cocaine with a combined weight of 1.6 grams. A sixth baggie contained 4.1 grams of rock and powder cocaine. The heroin was wrapped in 10 pieces of wax paper, and its combined weight was 3.2 grams.

A notebook was located inside the hotel room. The notebook contained a "pay-owe sheet." Defendant's cell phone contained another pay-owe document referencing people named Marisol, Poncho, Dope Fiend, and Lo. No drug paraphernalia was found in the hotel room.

**C. Defense Case**

Hampton, defendant's girlfriend, testified that she and defendant were living in the hotel together on September 30, 2016. At about 10:00 p.m. that evening, Hampton noticed a man standing by the front door of a different room at the hotel, where her friend was staying. Hampton saw the man and another person kicking on her friend's door. Hampton went over and told them to leave, then returned to her room. One of the men started banging on Hampton's door. Scared, she called defendant and "told him what was going on."

Later that evening, Hampton saw one of the men shooting a gun at defendant. She also saw defendant shooting. However, she later told the police that she "didn't know anything about a gun." She did not tell the police about someone kicking on her door, about being scared, or about calling defendant. Neither she nor defendant ever called 911.

Hampton was using cocaine at the time, but she was not selling drugs and did not know there were drugs in the hotel room.

Defendant testified that he was at Starbucks when Hampton called him. He drove back to the hotel, parked across the street, and ran towards the hotel. When he saw the Accord driver point a gun at him from inside a car, defendant put up his hands. He could see another person at that point, too. He was scared for himself and for Hampton.

Defendant ran back to the hotel room but looked back at the men in the parking lot. He saw them coming down the hallway, so he went into his room and shut the door. He "went for" his gun and told Hampton to go lie down in the bathtub, thinking the men were going to come kick in the hotel door or shoot through a window. He did not intend to shoot anyone; he planned to show the Accord driver that he

had a gun, too.

Defendant left his hotel room with the gun behind his back.  He walked towards the men, who were standing near a vending machine.  When defendant showed his gun to the men, one of them raised his gun and fired at defendant.  Defendant ducked and fired back.

Defendant admitted that when the police interviewed him, he denied being one of the shooters, even when an officer suggested that he might have shot in self-defense.  Defendant had prior felony convictions and was not supposed to possess any firearms.

Defendant admitted he had possessed the narcotics in the hotel room, claiming he planned to use them himself.

**D. Rebuttal Evidence**

When a defense investigator interviewed Hampton in November 2016, Hampton did not mention having a friend in another hotel room.  Hampton described seeing someone shoot at defendant from inside a car.  She saw defendant walk towards the car and "start firing back."

An investigator from the District Attorney's office retrieved photographs from one of defendant's cell phones and found photographs of various firearms.

*Murray*, 2018 WL 4959898, at *1-3.

## III.    DISCUSSION

### A.    Standard of Review

Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).  The petition may not be granted with respect to any claim adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the United States Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of

United States District Court
Northern District of California

United States District Court
Northern District of California

materially indistinguishable facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412-13 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Id.* at 409.

The state court decision to which Section 2254(d) applies is the "last reasoned decision" of the state court. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991).[2] In reviewing each claim, the court must examine the last reasoned state court decision that addressed the claim. *Cannedy v. Adams*, 706 F.3d 1148, 1158 (9th Cir.), *amended*, 733 F.3d 794 (9th Cir. 2013).

When a federal claim has been presented to a state court and the state court has summarily denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary. *Harrington v. Richter*, 562 U.S. 86, 98 (2011) (one-sentence order denying habeas petition analyzed under § 2254(d)). Accordingly, in reviewing the habeas claims not addressed by the state appellate court, this Court follows the Supreme Court's direction and "determine[s] what arguments or theories . . . could have supported" the California Supreme Court's rejection of the federal claim, and then gives deference to those arguments or theories under AEDPA. *Id.* at 102.

### B. Petitioner's Claims

Petitioner raises the following three claims for relief: (1) instructional error in giving an instruction regarding mutual combat; (2) numerous instances of ineffective assistance of trial counsel; and (3) sentencing error based on the trial court's decision not to stay two of the

---

[2] Although *Ylst* was a procedural default case, the "look through" rule announced there has been extended beyond the context of procedural default. *Barker v. Fleming*, 423 F.3d 1085, 1091 n.3 (9th Cir. 2005).

possession for sale convictions under Cal. Pen. Code § 654.

### 1.   Claim No. 1: Instructional Error

In Claim No. 1, Petitioner contends that the trial court erroneously instructed the jury on Mutual Combat under CALCRIM No. 3471, because that instruction was contrary to the evidence and inconsistent with his self-defense claim. The Supreme Court of California summarily denied this claim. The California Court of Appeal rejected this claim as follows:

> Defendant contends the trial court erred by instructing the jury on mutual combat, claiming there was no substantial evidence to support that instruction. Defendant contends the error requires reversal of counts 9, 10, and 11 (assault with a semiautomatic firearm, shooting at an inhabited dwelling, and shooting at an unoccupied vehicle).

> **1.   Proceedings Below**

> The trial court instructed the jury on self-defense and defense of another as to counts 9 through 12. The instruction told the jury that there were three requirements for finding that defendant acted in lawful self-defense or defense of another: (1) "the defendant reasonably believed that he or Christina Hampton was in imminent danger of suffering bodily injury or was in imminent danger of being touched unlawfully;" (2) "the defendant reasonably believed that the immediate use of force was necessary to defend against that danger;" and (3) "the defendant used no more force than was reasonably necessary to defend against that danger."

> The trial court then instructed the jury on mutual combat pursuant to CALCRIM No. 3471: "A person who engages in mutual combat or who starts a fight has a right to self-defense only if: One, he actually and in good faith tried to stop fighting. Two, he indicated by word or by conduct to his opponent in a way that a reasonable person would understand that he wanted to stop fighting and that he had stopped fighting and, three, he gave his opponent a chance to stop fighting. If the defendant meets these requirements, he then had a right to self-defense if the opponent continued to fight. [¶] However, if the defendant used only non[-]deadly force and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend himself with deadly force, and was not required to try to stop fighting, or communicate the desire to stop to the opponent, or give the opponent a chance to stop fighting. [¶] A fight is mutual combat when it began or continued by mutual consent or agreement. That agreement may be expressly stated or implied, and must occur before the claim to self-defense arose."

> When the trial court indicated it would give CALCRIM No. 3471, defendant's trial counsel commented, "I think we have to." But during argument to the jury, defendant's trial counsel argued, "This isn't a mutual combat situation ...."

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**2. Forfeiture/Invited Error**

The Attorney General contends defendant's claim is forfeited by his failure to object, and that the claim is barred by the invited error doctrine because defendant's trial counsel "acquiesced in the trial court's decision" to give CALCRIM No. 3471.

Defendant acknowledges there was no objection in the trial court, but he argues no objection was needed to preserve his claim for appeal because the instruction affected his substantial rights. (*See* Pen. Code, § 1259.)   He contends the invited error doctrine does not apply because the record fails to show his trial counsel had a tactical reason for acquiescing in the instruction.

We agree that the invited error doctrine does not apply on these facts. (*See People v. Moon* (2005) 37 Cal.4th 1, 28 [invited error doctrine does not apply if "the record fails to show counsel had a tactical reason for requesting or acquiescing in the instruction"].)   And although defendant failed to object to the instruction in the trial court, we will address the merits of his claim in order to determine whether the error affected his substantial rights (*see People v. Fran*co (2009) 180 Cal.App.4th 713, 719) and to forestall a claim that he received ineffective assistance of counsel (*see People v. Lua* (2017) 10 Cal.App.5th 1004, 1014).

**3. Analysis**

Jury instructions that are not supported by substantial evidence should not be given.   (*People v. Ross* (2007) 155 Cal.App.4th 1033, 1050 (*Ross* ).)   " 'It is error to give an instruction which, while correctly stating a principle of law, has no application to the facts of the case. [Citation.]' [Citation.]" (*Ibid*.)

"[A]s used in this state's law of self-defense, 'mutual combat' means not merely a reciprocal exchange of blows but one pursuant to mutual intention, consent, or agreement preceding the initiation of hostilities.... In other words, it is not merely the combat, but the preexisting intention to engage in it, that must be mutual." (*Ross*, *supra*, 155 Cal.App.4th at p. 1045, fn. omitted; *see People v. Nguyen* (2015) 61 Cal.4th 1015, 1044 (*Nguyen* ).)

In claiming it was error to give the mutual combat instruction, defendant relies on this court's decision in *Ross*.   In that case, the defendant engaged in "a heated exchange" with the female victim, who eventually walked over to the defendant and hit him two times. (*Ross*, *supra*, 155 Cal.App.4th at p. 1037.)   The defendant then punched the victim, who subsequently needed surgery and suffered from blurred vision.   The defendant was convicted of battery causing serious bodily injury and assault by means of force likely to produce great bodily injury.  (*Id*. at p. 1041.)

On appeal, the *Ross* defendant argued that the trial court should not have instructed the jury on mutual combat, and this court agreed: "[O]n this record, viewed in its entirety, no reasonable juror could conclude beyond a reasonable doubt that defendant and [the victim] were engaged in 'mutual combat' when he punched her." (*Ross*,

*supra*, 155 Cal.App.4th at p. 1050.) "Viewed most favorably to the prosecution, the evidence showed an exchange of belligerent comments culminating in an impulsive and unexpected blow by [the victim] to which defendant responded with a combination, flurry, or barrage of blows. There is simply not enough evidence for a reasonable juror to conclude beyond a reasonable doubt that when these blows were exchanged, both parties had formed the intent to engage in a fight." (*Id*. at p. 1052.)

In *Ross*, this court found that the mutual combat instruction was not harmless error. (*Ross*, *supra*, 155 Cal.App.4th at p. 1055.) First, the defendant had a prior trial in which the mutual combat instruction had not been given, and that proceeding had resulted in a mistrial. Second, the jury was not properly instructed on the meaning of "mutual combat," because that phrase had not been defined, even when the jury asked the trial court for a definition. (*Id*. at p. 1056.) Third, the evidence provided a basis for jurors to find that the defendant had acted in self-defense, since the victim had hit him two times and he could reasonably have expected to be hit again. (*Id*. at p. 1055.) Under those circumstances, there was a reasonable likelihood that the defendant would have achieved a more favorable result in the absence of the instructional error. (*Ibid.*; *see People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).)

The Attorney General contends the evidence here supported the mutual combat instruction because a jury reasonably could have found that defendant and the Accord driver had an implied agreement to fight. The Attorney General notes that defendant had returned with a gun within "minutes" of the initial confrontation and that defendant and the Accord driver had exchanged gunfire within "seconds" of defendant's return to the parking lot. The Attorney General also cites two cases in which there was evidence that the defendant and victim were members of rival gangs. (*See Nguyen*, *supra*, 61 Cal.4th at p. 1044; *People v. Quach* (2004) 116 Cal.App.4th 294, 297.)

Defendant asserts that nothing about the interaction in the parking lot constituted an agreement to fight. He also points out there was no evidence suggesting that defendant and the Accord driver were rival gang members, and no other evidence as to any preexisting relationship between them.

For purposes of our analysis, we will assume that there was insufficient evidence to support the mutual combat instruction and proceed to examine whether the assumed error was prejudicial.

Our prejudice analysis is necessarily different from that in *Ross*, in several important respects. First, this case did not involve a prior trial resulting in a mistrial. Second, the jury here was properly instructed on the definition of "mutual combat," so the jury could assess whether or not the instruction applied to this case. (*See Nguyen*, *supra*, 61 Cal.4th at p. 1050 [noting that CALCRIM No. 3471 was revised after *Ross* to include a definition of "mutual combat"].) Third, the evidence of self-defense in this case was much weaker than the evidence of self-defense in *Ross*, where the victim struck the defendant first and was in a position to strike him again. Here, no such immediate danger was posed by the Accord driver, who

remained sitting in his car with a gun as defendant passed by. Rather, defendant instigated the shooting by going to his hotel room, getting a gun, and approaching the Accord. Defendant also did not tell the police he acted in self-defense, even when the police suggested that scenario.

Defendant's prejudice argument centers on the jury's requests during deliberations and the length of deliberations. However, the number of jury requests and questions were not "numerous," and the jury did not deliberate "for a long time." The jury asked to watch the surveillance video, requested a definition of "imminent," and asked for an instruction on "stand your ground." The jury deliberated for about two hours after jury instructions were given and for three hours 30 minutes the following day. Moreover, the fact that the jury asked to review evidence and requested further instructions is indicative of the jury's diligence, not that the case was close. (*See People v. Houston* (2005) 130 Cal.App.4th 279, 301.) And the time the jury spent deliberating can " 'easily be reconciled with the jury's conscientious performance of its civic duty, rather than its difficulty in reaching a decision,' " particularly in light of the number of charges in this case. (*See ibid*.)

In arguing prejudice, defendant also notes that during argument to the jury, the prosecutor asserted that there had been mutual combat. The prosecutor discussed the jury instruction and then argued: "Now mutual combat, when it began or continued by mutual consent or agreement. Now, in this case, probably didn't begin that way, but when they both pull out guns, they're both shooting at each other, it's not clear who, if anyone, is acting in self-defense. We've achieved a mutual combat situation."

Nothing in the foregoing argument makes it reasonably probable that the jury was misled about mutual combat. Contrary to defendant's claim, the prosecutor did not erroneously imply that defendant could not be acting in self-defense if he and the Accord driver were "shooting simultaneously." The prosecutor acknowledged that one of the shooters might be "acting in self-defense" and told the jury that mutual combat required "mutual consent or agreement." Moreover, even if we assume that the prosecutor's argument was misleading, we presume the jury followed the instructions instead. (*See People v. Centeno* (2014) 60 Cal.4th 659, 676.)

Finally, an examination of the record shows that it is not reasonably probable any of the jurors would have found defendant acted in self-defense or defense of another had the trial court not given the mutual combat instruction. (*See Watson, supra*, 46 Cal.2d at p. 836.) The evidence did not show that defendant actually or reasonably believed he was in imminent danger. Rather, the evidence showed that after defendant saw the Accord driver brandish a gun while sitting in a car in the parking lot, defendant reached a place of safety—his hotel room—but decided to return to the parking lot with his own gun concealed behind his back. Defendant also made no self-defense claim when he was contacted by the police on the night of the shooting. For these same reasons, we conclude beyond a reasonable doubt that the mutual combat instruction did not contribute to the verdict. (*See Chapman v. California* (1967) 386 U.S. 18, 24.)

1

2

In sum, we find no prejudicial error with respect to the instruction on mutual combat.

*Murray*, 2018 WL 4959898, at \*5-8.

3

4

5

6

7

8

9

10

11

12

13

Claims of error in state jury instructions are generally matters of state law only and thus not cognizable on federal habeas review. *See Gilmore v. Taylor*, 508 U.S. 333, 344 (1993). To obtain federal relief for errors in the jury charge, a petitioner must show that the erroneous instruction by itself so infected the entire trial that the resulting conviction violates due process. *See Estelle v. McGuire*, 502 U.S. 62, 72 (1991). The challenged instruction must be more than merely erroneous; instead, a petitioner must show there was a "reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution." *Middleton v. McNeil*, 541 U.S. 433, 437 (2004) (citations omitted). If a constitutional error occurred, federal habeas relief remains unwarranted unless the error caused prejudice, *i.e.*, unless it had a substantial and injurious effect or influence in determining the jury's verdict. *Hedgpeth v. Pulido*, 555 U.S. 57, 61-62 (2008) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993)).

14

15

16

17

18

19

20

21

22

23

24

25

26

27

The state court's rejection of this claim was not unreasonable. Petitioner does not argue that the instruction itself was erroneous, but instead claims that the instruction did not fit the evidence adduced at trial. Petitioner does not cite, nor has this Court located, "any clearly established law that constitutionally prohibits a trial court from instructing a jury with a factually inapplicable but accurate statement of state law." *Fernandez v. Montgomery*, 182 F. Supp. 3d 991, 1011 (N.D. Cal. 2016); *see also Steele v. Holland*, No. 15-CV-01084-BLF, 2017 WL 2021364, at \*8 (N.D. Cal. May 12, 2017) ("giving an instruction which is not supported by evidence is not a due process violation."); *Larrabee v. Pollard*, No. EDCV180049JGBPVC, 2020 WL 5665812, at \*21 (C.D. Cal. Aug. 13, 2020) (finding factual challenge to trial court's use of CALCRIM No. 3471 did not state a cognizable federal claim), *report and recommendation adopted*, No. EDCV180049JGBPVC, 2020 WL 5658716 (C.D. Cal. Sept. 22, 2020). In a somewhat analogous situation, the Supreme Court has held that it does not violate due process to instruct a jury on a legal theory that lacks evidentiary support "since jurors are well equipped to analyze the evidence". *Griffin v. United States*, 502 U.S. 46, 59-60 (1991).

28

Further, as reasonably noted by the state court, the mutual combat instruction did not

United States District Court
Northern District of California

prejudice Petitioner's defense.  Petitioner's theory was that he fired his gun to defend himself from

attack by the occupants of the Accord.  If the jurors believed Petitioner's theory, the mutual

combat instruction did not preclude them from finding that Petitioner acted in self-defense.

Rather, the mutual combat instruction stated only that under specific circumstances, Petitioner

could not legitimately claim self-defense.  If, as Petitioner argues, the evidence did not fit those

circumstances, then the jury was free to disregard the mutual combat instruction.  The judge

specifically directed the jury to follow only the instructions that applied to the facts of the case:

"[s]ome of these instructions may not apply depending on your findings about the facts of the

case.  Do not assume just because I give a particular instruction that I'm suggesting anything about

the facts.  After you have decided what the facts are, follow the instructions that do apply to the

facts as you find them."  (Dkt No. 16-9 at 64); *see Weeks v. Angelone*, 528 U.S. 225, 234 (2000)

("[a] jury is presumed to follow its instructions).  Because the mutual combat instruction did not

have a substantial and injurious effect or influence in determining the jury's verdict, the state

court's decision denying this claim was not an unreasonable application of Supreme Court

precedent or an unreasonable determination of the facts.  *See Pulido*, 555 U.S. at 61-62.  Habeas

relief is denied on Claim No. 1.

### 2.    Claim No. 2: Ineffective Assistance of Counsel

Petitioner argues that his trial counsel was ineffective for (1) failing to provide Petitioner

with various documents; (2) aiding the prosecution in securing a biased jury with no African

American jurors; (3) failing to request a change of venue; (4) failing to object to the mutual

combat jury instruction; (5) failing to object to the prosecution's violations of the California

Evidence Code; (6) failing to properly investigate and present to the jury why Petitioner owned a

firearm; and (7) failing to provide Petitioner with sufficient information to consider a plea deal.

Petitioner raised these claims in his state habeas petition, all of which were summarily denied by

the California Supreme Court and are entitled to AEDPA deference.  *See Harrington*, 562 U.S. at

102 (explaining that on habeas review, the reviewing court must determine what theories could

have supported the state court's rejection of the claims.)

The Sixth Amendment guarantees the accused the "right . . . to have the Assistance of

Counsel for his defense." U.S. Const. amend. VI.  The right to counsel is the right to the effective

assistance of counsel, and counsel can deprive a defendant of the right by failing to render

adequate legal assistance. *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  In order to prevail

on a Sixth Amendment ineffectiveness of counsel claim, a defendant must establish two things.

First, the defendant must establish "that counsel's representation fell below an objective standard

of reasonableness." *Id*. at 687-88.  Second, the defendant must establish that he was prejudiced by

counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different." *Id*. 694.  On habeas

review, it is not enough for a federal court to have found counsel ineffective.  The federal court

must also find that the state court's resolution of the issue was unreasonable, a higher standard.

*Harrington*, 562 U.S. at 101.

### a.   Failure to Provide Legal Documents

Petitioner contends that his trial counsel failed to respond to Petitioner's requests to be sent

documents in his file.  In support of his argument, Petitioner attaches letters he sent to trial counsel

requesting various items in preparation for trial.  (*See* Dkt. No. 1 at 35-42.)

Petitioner appears to argue that the documents were necessary to aid his trial counsel in

forming a trial strategy.  But trial counsel is not required to review all tactical decisions with his or

her client.  *See Gonzalez v. United States*, 553 U.S. 242, 249 (2008) ("[t]he presentation of a

criminal defense can be a mystifying process . . . [and depends] upon tactical considerations of the

moment and the larger strategic plan for the trial," and "to require in all instances that they be

approved by the client could risk compromising the efficiencies and fairness that the trial process

is designed to promote"); *Schell v. Witek*, 218 F.3d 1017, 1026 and n.8 (9th Cir. 2000) (counsel is

entitled to make tactical decisions even if his client disapproves of them).

In addition, Petitioner fails to show that had the items in his file been provided to him, the

result of the proceeding would have been different — a necessary showing under *Strickland*.

Petitioner states only that his multiple requests for documents went ignored.  Because Petitioner

fails to explain how the documents would have altered the outcome of his trial, Petitioner falls far

short of meeting his burden under *Strickland*.

13

b.   Failure to Raise *Batson* Challenge

Petitioner next contends that his counsel was ineffective in failing to secure a jury with African American jurors: "trial counsel effectively aided the prosecution in securing a biased jury that was partial by race." (Dkt. No. 1 at 7.)  Specifically, he argues that trial counsel failed to object when the prosecutor struck one of two possible African American jurors, and defense counsel improperly challenged the other remaining African American juror.

The Equal Protection Clause prohibits purposeful racial discrimination in the selection of the jury. *Batson v. Kentucky*, 476 U.S. 79, 86 (1986).  In *Batson*, the Supreme Court outlined a three-step process for evaluating claims that a prosecutor has used peremptory challenges in a manner violating the Equal Protection Clause: 1) a defendant raising a *Batson* claim must establish a *prima facie* case of discrimination; 2) once a *prima facie* case of discrimination is established, the burden of offering race-neutral reasons for the strikes shifts to the prosecutor; 3) after the prosecutor offers race-neutral reasons, the trial court has the duty to determine if the defendant has established purposeful discrimination. *Paulino v. Harrison*, 542 F.3d 692, 699 (9th Cir.2008) (citing *Batson*, 476 U.S. at 98).  To establish a *prima facie* case of purposeful discrimination, the accusing party must show that (1) the prospective juror is a member of a cognizable group, (2) the prosecutor used a peremptory strike to remove the juror, and (3) the totality of the circumstances raises an inference that the strike was motivated by race. *Boyd v. Newland*, 476 F.3d 1139, 1143 (9th Cir. 2006).  Importantly, "a defendant has no right to a 'petit jury composed in whole or in part of persons of his own race,' but rather the right to be tried by a jury whose members are selected pursuant to nondiscriminatory criteria." *Batson*, 476 U.S. at 85-86.

Petitioner's failure to raise the *Batson* issue during trial resulted in a trial record that is not sufficiently developed to support a full evaluation of the jury selection practice under *Batson*. *See Haney v. Adams*, 641 F.3d 1168, 1169 (9th Cir. 2011) (holding that a petitioner may not bring a *Batson* claim in his habeas petition if he did not object to the peremptory strikes during his state trial).  Nevertheless, even assuming the Court can entertain this claim in the context of ineffective assistance of counsel, Petitioner's claim fails because he has not shown the necessary prejudice under *Strickland*.

United States District Court
Northern District of California

1    A petitioner faulting counsel for failing to raise a *Batson* objection at trial must show a

2  reasonable probability that he would have prevailed on a *Baston* claim.  *See Carrera v. Ayers*, 699

3  F.3d 1104, 1108 (9th Cir. 2012) ("Because we are evaluating the likelihood of success of

4  [petitioner's] hypothetical *Wheeler* objection in the context of an ineffective assistance claim, he

5  has the burden to show under *Strickland* a reasonable probability he would have prevailed on a

6  *Wheeler* claim.")[3]  A review of the jury *voir dire* transcript shows that the prosecutor exercised

7  eight peremptory challenges and the defense exercised ten.  (*See* Dkt. No. 23-1.)  While the race of

8  the excused jurors is not evident from the transcript, a review of the questions posed to the jurors,

9  and their respective answers, fails to raise an inference that any jurors were struck because of their

10  race.  A majority of jurors excused by the prosecutor stated that they had been arrested or had

11  family members arrested.  Many of the jurors excused by the defense stated that they, family

12  members, or friends worked as correctional officers and/or law enforcement officers.

13    In his supplemental traverse, Petitioner states that Juror No. 11 (who was excused by the

14  prosecution) and Juror No. 39 (who was excused by the defense) were both African American.

15  (Dkt. No. 26 at 3.)  Based on the transcript, there is simply nothing to indicate that the prosecutor

16  or defense counsel sought to eliminate these two prospective jurors based on race.  Accordingly, it

17  is unlikely Petitioner would have prevailed on a *Baston* objection at trial.  *See Carrera*, 699 F.3d

18  at 1108.

19    In addition, Petitioner has made no showing that would suggest a discriminatory purpose

20  in the use of preemptory strikes.  He supports his claim with the bare assertion that the prosecution

21  and trial counsel struck the only two African Americans on the jury panel.  He has failed to

22  provide a single other reason to justify his claim of a discriminatory strike.  *See Powers v. Ohio*,

23  499 U.S. 400, 415 (1991) (stating that the defendant has the burden of establishing a *prima facie*

24  case of purposeful discrimination); *Williams v. Woodford*, 384 F.3d 567, 583-84 (9th Cir. 2002, as

25  amended Sept. 9, 2004) (denying certificate of appealability with respect to petitioner's *Batson*

26

27  _____

[3] A *Wheeler* objection is the California equivalent of a *Batson* challenge.  *See People v. Wheeler*,

28  22 Cal. 3d 258 (1978).

1  claim where petitioner failed to include sufficient factual allegations to establish a *prima facie* case

2  of discrimination under *Batson*); *United States v. Vasquez-Lopez*, 22F.3d 900, 902 (9th Cir. 1994)

3  (stating that striking the only African-American juror in the venire is not sufficient to establish a

4  *prima facie* case).  Because Petitioner cannot state a *prima facie Batson* claim, he cannot show that

5  trial counsel's performance was deficient or that prejudice resulted from counsel's conduct.  Given

6  the strong presumption that trial counsel provided effective representation, Petitioner fails to meet

7  his burden under *Strickland*. [4]

            c.   Failure to Move for Change of Venue

9            Next, Petitioner argues that his counsel was ineffective in failing to move for a change of

10  venue.  Just prior to opening statements, Petitioner expressed to the trial judge that he wanted to

11  move for a change of venue.  (Dkt No. 16-7 at 12.)  The judge responded, "You've talked to your

12  attorney about the fact that the trial has started and timeliness and chances of success? . . .

13  Counsel's advised you that he doesn't feel it's appropriate in this case, which I agree."  (*Id*.)

14            Petitioner alleges that he conferred with defense counsel about the lack of African

15  American jurors and requested a change of venue, to which counsel replied it was not a good time

16  for that.  (Dkt. No. 1 at 8.)  He also attaches a letter directed to the trial court, in which he asked

17  for a change of venue, citing the lack of African American jurors, the connection of jurors to law

18  enforcement, jurors' familiarity with the facts of the case and their possible familiarity with the

19  victim.  (*Id*. at 38-39.)

20            The state court's rejection of this claim was not unreasonable.  First, Petitioner's

21  speculation that some of the jurors were familiar with the victim and the facts of the case is

22  unfounded.  The *voir dire* transcript reveals that the judge asked the jurors about this precise issue:

23  "Do any of you have any prior knowledge about the facts or people involved in this case, or any

24  personal or financial interest in how this case is decided?"  (*See* Dkt. No. 23-1 at 4); (*see also* Dkt.

25

---

26  [4] In his supplemental traverse, Petitioner refers to a Monterey County census which shows that in
    2019 — two years after Petitioner's trial — 3.4% of the Monterey County population was Black
27  or African American.  (Dkt. No. 26 at 7.)  Petitioner also states that "the trial court called 58
    people for Voir Dire . . . and the Petitioner can confirm by his presence at the proceedings, that
28  only two of the 58 called were Black."  (*Id*. at 2.)  Nothing about these asserted facts changes the
    Court's analysis.

United States District Court
Northern District of California

1   No. 23-1 at 107, 139, 170.)  No jurors responded in the affirmative.  Following the judge's general

2   questions, each prospective juror was questioned about his or her familiarity with the facts of the

3   case and individuals involved in the case.  One juror, who was later excused, indicated he had

4   recognized the defendant's name on the news, but recalled nothing about the case.  (*Id*. at 33.)

5        With respect to any juror's connection to law enforcement, the Ninth Circuit has explained

6   that "[w]e will not presume bias merely because a juror works in law enforcement or is a federal

7   government employee."  *Tinsley v. Borg*, 895 F.2d 520, 529 (9th Cir. 1990).  Moreover, each

8   prospective juror was questioned multiple times about his or her ability to be impartial, and the

9   selected jurors indicated they could listen to the evidence and decide accordingly.

10       Finally, regarding the makeup of the jury, Petitioner is not entitled to have a jury composed

11  of members of his racial background.  *See Batson*, 476 U.S. at 85 ("a defendant has no right to a

12  petit jury composed in whole or in part of persons of his own race.") (citation and quotation marks

13  omitted).  The Constitution only prohibits the purposeful exclusion of jury members belonging to

14  a certain racial group, and "[d]efendants are not entitled to a jury of any particular composition."

15  *Holland v. Illinois*, 493 U.S. 474, 483 (1990) (citation omitted).  As already discussed, there is no

16  evidence of purposeful exclusion of African American jurors.  Thus, there is nothing in the record

17  to indicate that counsel had any basis on which to request a change of venue.  For these reasons,

18  counsel cannot be faulted for deciding not to move for a change of venue.  *See Rupe v. Wood*, 93

19  F.3d 1434, 1445 (9th Cir. 1996) ("[T]he failure to take a futile action can never be deficient

20  performance").  Because the state court's rejection of this claim was neither contrary to nor an

21  unreasonable application of Supreme Court precedent, this claim is DENIED.

22                        d.   Failure to Object to Jury Instruction

23       Petitioner argues that trial counsel was ineffective in failing to object to the jury instruction

24  on mutual combat.  As already explained in Section IIIB1, Petitioner has not shown that he was

25  prejudiced by the mutual combat instruction.  If the jurors found the instruction inapplicable based

26  on the facts of the case, they were free to disregard the instruction, as charged by the trial judge.

27  (*See* Dkt No. 16-9 at 64.)  Insofar as Petitioner has not shown that he was prejudiced by the

28  instruction itself, he similarly has not shown how he was prejudiced by his counsel's failure to

United States District Court
Northern District of California

1    object to the instruction.  *See Rupe*, *supra*, 93 F.3d at 1445.  Accordingly, the California Supreme

2    Court's summary denial of this claim was not unreasonable.

3                    e.   Failure to Object to Prosecutorial Misconduct

4            Petitioner contends that his counsel failed to object to the admission of various

5    photographs by the prosecution.  He argues that certain photographs depicting various rooms in

6    the motel had "absolutely no relevance to the case" and that a number of the photographs of the

7    crime scene were "duplicate . . . excessive . . and ma[de] the petitioner appear overwhelmingly

8    guilty towards jurors."  (Dkt. No. 1 at 10.)  As evidenced in the trial record, the prosecutor laid the

9    foundation for the photographs through the testimony of various police officers who were familiar

10   with the motel and the criminal investigation.  The prosecutor first questioned Officer Grave about

11   the layout of the Continental Motel.  (Dkt. No. 16-7 at 25-27.)  During his testimony, the officer

12   reviewed various photographs depicting images of the motel and rooms inside, which he affirmed

13   accurately showed what the motel looked like on the night of the shooting.  (*Id*. at 32.)  The

14   prosecutor later questioned additional officers who were involved with the crime scene

15   investigation, and they were shown various photographs depicting bullet holes on the motel and

16   vehicles, shell casings, the motel room where Petitioner had been living, and various items in the

17   motel room.  (*Id*. at 54-121.)  Based on the testimony, it is evident that each photograph was

18   relevant to the criminal investigation.  While some photographs may have appeared repetitive,

19   each photograph provided additional information to the jury, such as by showing the direction of

20   the shooting, providing enlarged pictures of the shell casings, and establishing the exact location

21   where the evidence was located in the motel room.  (*Id*.)  Based upon the record, there was no

22   basis for defense counsel to object to the admission of routine photographs by the prosecutor.

23           Petitioner also has not shown that he was prejudiced by his counsel's failure to object to

24   the photographs.  Apart from arguing that they were excessive, there is simply nothing to indicate

25   that had several of the photographs been excluded, the result of the proceeding would have been

26   different.  *See Strickland*, 466 U.S. at 694.  The jury would have still seen photographs of the gun,

27   bullet holes, shell casings, and the drugs, which overwhelmingly implicated Petitioner in the

28   crimes.  Accordingly, the California Supreme Court did not unreasonably deny this claim.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Petitioner also contends that his counsel failed to object when the prosecutor badgered his

2    sole witness by asking "leading and directing question[s.]"  (Dkt. No. 1 at 10.)  In support of his

3    claim, Petitioner attaches various excerpts from the transcript on cross-examination of Christine

4    Hampton.  (*Id*. at 57-70.)  Petitioner appears to take issue with the prosecutor repeatedly ending

5    his question with the words "correct" or "right" and asking follow-up questions for clarification.

6    (*Id*.)

7    First, a review of the full transcript establishes that trial counsel did, at times, object to the

8    cross-examination, and specifically objected to a certain line of questioning as argumentative.

9    (Dkt. No. 16-8 at 18-20, 25-27.)  Second, the record reflects that trial counsel examined Hampton

10    on redirect, to provide her an opportunity to explain the potential inconsistencies in her testimony.

11    (*Id*. at 31-33.)  Finally, with respect to the leading questions, California rules of evidence permit

12    leading questions on cross-examination: "[a] leading question may be asked of a witness on cross-

13    examination or recross-examination."  Cal. Evid. Code § 767.  Because leading questions are

14    permissible under California evidentiary rules, there was no basis for counsel to object to them.

15    Thus, Petitioner fails to establish that his counsel was deficient under *Strickland* and fails to show

16    that the California Supreme Court's denial of this claim was unreasonable.

17                          f.    Failure to Investigate

18    Petitioner argues that his counsel was deficient in failing to investigate Petitioner's past

19    exposure to gun violence, as well as his history of self-medicating because of depression and

20    anxiety.  Petitioner contends that this information would have supported the defense theory that

21    Petitioner acted in self-defense and the drugs were for personal use.  (Dkt. No. 1 at 11-17.)

22    In general, an attorney must make reasonable investigations, and "cannot justify a failure

23    to investigate simply by invoking strategy."  *Weeden v. Johnson*, 854 F.3d 1063, 1070 (9th Cir.

24    2017) (citing *Wiggins v. Smith*, 539 U.S. 510, 521 (2003)).  To determine the reasonableness of a

25    decision not to investigate, the court must apply "a heavy measure of deference to counsel's

26    judgments."  *Wiggins*, 539 U.S. at 521-522 (quoting *Strickland*, 466 U.S. at 691).

27    From the outset, Petitioner fails to indicate whether he informed counsel of his mental

28    diagnoses and exposure to gun violence, and whether counsel made any effort to investigate

19

United States District Court
Northern District of California

1    Petitioner's background.  *See, e.g.*, *Babbitt v. Calderon*, 151 F.3d 1170, 1174 (9th Cir. 1998)

2    (attorney's failure to uncover family history of mental illness not unreasonable where investigation

3    revealed no indication of such a history).

4         More importantly, under the prejudice prong of *Strickland*, Petitioner is only entitled to

5    relief if he shows that but for counsel's unprofessional errors, the result of the proceeding would

6    have been different.  *Strickland*, 466 U.S. at 694.  Here, Petitioner makes no attempt to prove

7    prejudice.  Petitioner has not provided any evidence establishing that he suffers from diagnosed

8    mental illnesses, or that any evidence of his history would have been admissible at trial.  *See*

9    *Franklin v. Johnson*, 290 F.3d 1223, 1234 (9th Cir. 2002) (finding petitioner failed to establish

10   prejudice from any deficient performance by counsel where the "post-conviction record

11   contain[ed] no testimony whatsoever, expert or otherwise, concerning the impact of any mental

12   disease or defect on [petitioner's] commission of the crime with which he was charged."); *Dows v.*

13   *Wood*, 211 F.3d 480, 486 (9th Cir. 2000) (petitioner does not prove *Strickland* prejudice where he

14   does not specify with sufficient proof what helpful testimony witnesses would have offered).

15        And even assuming Petitioner requested that counsel investigate his background, he still

16   fails to indicate how the result of the proceedings would have been different given this

17   information.  First, defense counsel did present a theory of self-defense at trial.  Petitioner, who

18   testified at trial, recounted his substantial fear of immediate danger after seeing the driver of the

19   car flash a gun.  (*See* Dkt. No. 16-8 at 40-43.)  This theory was thoroughly reviewed by defense

20   counsel at closing.  (Dkt. No. 16-9 at 41-48.)  There is no reason to conclude that any possible

21   additional evidence that Petitioner generally feared guns because of a violent childhood would

22   have made a difference to the jury.  Under California law, self-defense requires a defendant to

23   reasonably believe that s/he is in *imminent* danger.  *See* CALCRIM No. 3470.  Thus, any history

24   of past exposure to violence likely would have been of limited value in persuading the jury that, at

25   the precise time of shooting, deadly force was justified.  Notably, Petitioner's entire theory was

26   severely undercut when he did not inform the police that he acted in self-defense when initially

27   asked about the shooting.

28        Petitioner also fails to prove prejudice regarding his alleged history of self-medicating.

20

1   First, defense counsel questioned Petitioner about the drugs in his room, and Petitioner affirmed

2   that they were for personal use. (Dkt. No. 16-8 at 66-67.)  Second, given the overwhelming

3   evidence indicating that the drugs were for sale — the quantity of drugs, the individual packaging

4   of the drugs, the pay-owe sheet, and the text messages on Petitioner's cell phone — any additional

5   evidence regarding Petitioner's self-medicating would have been unlikely to sway the jury.  For

6   these reasons, the state court's rejection of Petitioner's ineffectiveness claim was not

7   unreasonable.

   g.   Failure Regarding the Plea Deal

8

9           Petitioner avers that had he been properly apprised of the evidence against him, he would

10   have taken a plea deal.  (Dkt. No. 1 at 17.)  In advising a defendant, "[c]ounsel cannot be required

11   to accurately predict what the jury or court might find, but he can be required to give the defendant

12   the tools he needs to make an intelligent decision." *Turner v. Calderon*, 281 F.3d 851, 881 (9th

13   Cir. 2002).  The Court applies a presumption that counsel's conduct was within the range of

14   reasonable professional advice. *See Burt v. Titlow*, 571 U.S. 12, 22-23 (2013) (concluding that

15   absent any evidence demonstrating that counsel gave inadequate advice regarding withdrawal of a

16   guilty plea, there is strong presumption that counsel's performance was not deficient).  Here,

17   Petitioner's broad accusations that he was "misinformed as to the facts and evidence of this case"

18   are insufficient to establish that his counsel failed to render reasonably professional advice with

19   respect to a plea offer.  The state court's rejection of this claim was not unreasonable.

20           3.   **Claim No. 3: Sentencing Error**

21           Petitioner avers that he improperly received multiple punishments for a single offense in

22   violation of California Penal Code § 654.  He also contends that his sentence violates the Double

23   Jeopardy Clause of the Constitution.  Respondent maintains that the double jeopardy component

24   of Petitioner's claim is unexhausted.  (*See* Dkt. No. 16-1 at 24.)  To the extent this component of

25   the claim is unexhausted, the Court denies it on the merits.  *See* 28 U.S.C. § 2254(b)(2) ("[a]n

26   application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of

27   the applicant to exhaust the remedies available in the courts of the State.)

28           Petitioner's overall sentencing claim was summarily denied by the Supreme Court of

United States District Court
Northern District of California

21

California.  The California Court of Appeal rejected the claim under California state law, as follows:

> Defendant contends the trial court was required to stay the terms for two of his three convictions for possession for sale of narcotics.
>
> **1. Legal Standards**
>
> "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." (Pen. Code, § 654, subd. (a).) Thus, Penal Code section 654 "precludes multiple punishment for a single act or omission, or an indivisible course of conduct." (*People v. Deloza* (1998) 18 Cal.4th 585, 591 (Deloza ).) " 'Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of [Penal Code] section 654 depends on the intent and objective of the actor.  If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.' [Citation.]" (*People v. Latimer* (1993) 5 Cal.4th 1203, 1208.)
>
> A trial court's finding of separate intents or objectives is "a factual determination that must be sustained on appeal if supported by substantial evidence [citation]." (*People v. Osband* (1996) 13 Cal.4th 622, 730.)
>
> 2. Analysis
>
> At the sentencing hearing, the trial court cited *People v. Monarrez* (1998) 66 Cal.App.4th 710 (*Monarrez* ) when it imposed consecutive terms for count 3 (possession of cocaine for sale), count 4 (possession of heroin for sale), and count 5 (possession of methamphetamine for sale).
>
> In *Monarrez*, the police searched a residence and found narcotics packaged for sale.  The defendant was convicted of possession for sale of heroin and possession for sale of cocaine, and the trial court imposed separate sentences for those offenses.  (*Monarrez, supra*, 66 Cal.App.4th at p. 712.)  The appellate court noted that prior cases had held "that Penal Code section 654 'does not preclude multiple punishment for simultaneous possession of various narcotic drugs.' [Citation.]"  (*Id.* at p. 714.)  The court agreed with those cases and found substantial evidence of the defendant's different intents and objectives in possessing the two types of narcotics for sale.  "The evidence supported a finding that defendant had been engaged in multiple sales and intended to make multiple sales of the narcotics which he possessed."  (*Id.* at p. 715.)
>
> The *Monarrez* court added an additional reason why separate punishment was warranted: "The narcotics are separately classified and regulated by the Legislature; they have different effects and pose different hazards to society."  (*Monarrez, supra*, 66 Cal.App.4th at p.

715.)

Defendant contends that the reasoning of *Monarrez* "does not survive" the California Supreme Court's more recent decision in *People v. Jones* (2012) 54 Cal.4th 350 (*Jones*). In *Jones*, the defendant was convicted of three firearm possession offenses based on his possession of one gun. (*Id.* at p. 352.) The trial court imposed separate sentences for the three offenses, and the appellate court upheld those separate sentences on appeal, but the California Supreme Court reversed, holding that Penal Code section 654 prohibited multiple punishment because the defendant's convictions "were based on a single act." (*Jones*, *supra*, at p. 360.) The *Jones* court rejected the notion that multiple punishment is permitted where a single act is punishable under multiple statutes "directed at distinct societal evils." (*Jones*, *supra*, at p. 356.)

The California Supreme Court recognized that "[i]n some situations, physical acts might be simultaneous yet separate for purposes of [Penal Code] section 654." (*Jones*, *supra*, 54 Cal.4th at p. 358.) For example, " 'simultaneous possession of different items of contraband' are separate acts" that may be subject to multiple punishment, since the possession of each item is " 'a separate act of possession.' [Citation.]" (*Ibid.*) The court specified that it did not "intend to cast doubt on the cases so holding." (*Ibid.*)

Defendant asserts that despite the *Jones* court's comments, its rationale "strongly undermines" the cases—including *Monarrez*—finding that Penal Code section 654 does not bar multiple punishment where the defendant has convictions for possession of multiple items. We agree that *Jones* does undermine the additional reason *Monarrez* upheld multiple punishment for possession of different narcotics—i.e., the fact that different statutes apply to different substances. (*See People v. Chung* (2015) 237 Cal.App.4th 462, 471.) However, *Jones* does not undermine the main rationale of *Monarrez*: that the defendant had different intents and objectives in possessing the two types of narcotics for sale, since the evidence supported a finding that the *Monarrez* defendant had previously engaged in multiple sales and intended to make "multiple sales of the narcotics which he possessed." (*Monarrez*, *supra*, 66 Cal.App.4th at p. 715.)

In the present case, substantial evidence supports a finding that defendant had multiple intents and objectives in possessing the three different narcotics substances. In light of the large amount of narcotics and the many separate packages, a reasonable trier of fact could find that defendant intended to make multiple sales of the narcotics to multiple different people. (Cf. *In re Adams*(1975) 14 Cal.3d 629, 635 [defendant "simultaneously transported a variety of illegal drugs with the single intent and objective of delivering them to" one person].) Defendant was not convicted of the three narcotics possession offenses based on "a single act or omission" (*Deloza*, supra, 18 Cal.4th at p. 591) but rather based on "simultaneously yet separate" physical acts (*Jones*, *supra*, 54 Cal.4th at p. 358). Multiple punishment was therefore not prohibited by Penal Code section 654.

*Murray*, 2018 WL 4959898, at *4-5.

United States District Court
Northern District of California

A challenge to the provisions of a state sentencing law does not generally state a federal habeas claim. *Christian v. Rhode*, 41 F.3d 461, 469 (9th Cir. 1994) ("Absent a showing of fundamental unfairness, a state court's misapplication of its own sentencing laws does not justify federal habeas relief"). Rather, a federal habeas court is bound by the state court's determination concerning the provisions of state law. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("[A] state court's interpretation of state law . . . binds a federal court sitting in habeas corpus"). On federal habeas review, the question "is not whether the state sentencer committed state-law error," but whether the sentence imposed on the Petitioner is "so arbitrary and capricious" as to constitute an independent due process violation. *Richmond v. Lewis*, 506 U.S. 40, 50 (1992). A petitioner "may not . . . transform a state-law issue into a federal one merely by asserting a violation of due process". *See Langford v. Day*, 110 F.3d 1380, 1389 (9th Cir. 1996). The Ninth Circuit has specifically held that habeas relief is unavailable for an alleged violation of Cal. Penal Code § 654. *Watts v. Bonneville*, 879 F.2d 685, 687 (9th Cir. 1989) ("[petitioner] bases his state law argument on Cal. Penal Code § 654 [and] [a]lthough it seems highly unlikely that the California courts violated this provision in sentencing [petitioner] we cannot review the contention as a matter of state law because 28 U.S.C. § 2254(a) . . . authorizes the federal courts to grant habeas corpus relief only for violations of federal law.").

Petitioner contends that he was punished multiple times for the same act. Contrary to his argument, the state appellate court found, under California law, that Petitioner was punished for multiple violations of the criminal statute, as opposed to multiple punishments for the same crime. The court explained that Petitioner engaged in "simultaneous yet separate physical acts" in possessing the narcotics. *See Murray*, 2018 WL 4959898, at *5 (citation and quotation marks omitted). As noted by the state court and reflected in the record, Petitioner was in possession of three different narcotics — cocaine, heroin, and methamphetamine — at the time the officers searched his motel room. (*See* Dkt. No. 16-7 at 121-23.) Testimony at trial revealed that Petitioner received various text messages from potential buyers requesting specific types of drugs. (*Id*. at 65-67.) Based on the evidence, it was not unreasonable for the state court to conclude that Petitioner's intent or objective in possessing each type of drug was different. Thus, the state

1   court's decision not to stay the various sentences was not so arbitrary or capricious as to deny

2   Petitioner due process.  Nor is there any indication that Petitioner was punished for the same

3   criminal act.  *See, e.g., Watts*, 879 F.2d at 688 (no due process violation when petitioner was

4   punished for separate criminal acts, not twice for the same act).

5         Petitioner's additional argument that his sentencing violated the Double Jeopardy Clause is

6   without merit.  The Double Jeopardy Clause "protects against multiple punishment for the same

7   offense."  *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969), *overruled in part on other grounds*

8   in *Alabama v. Smith*, 490 U.S. 794 (1989).  However, the Supreme Court has made clear that the

9   "protection against multiple punishments for the same offense d[oes] not necessarily preclude

10   cumulative punishments in a single prosecution.  The key to determining whether multiple charges

11   and punishments violate double jeopardy is legislative intent."  *Plascencia v. Alameida*, 467 F.3d

12   1190, 1204 (9th Cir. 2006) (internal citations omitted).

13         The California legislature enacted Cal. Penal Code § 654 to prohibit multiple punishment

14   for the same act or omission.  California state law allows for consecutive sentencing for crimes

15   with objectives that are predominantly different from each other: "[w]hether a course of criminal

16   conduct is divisible and therefore gives rise to more than one act within the meaning of section

17   654 depends on the *intent and objective* of the actor."  *People v. Latimer*, 5 Cal. 4th 1203, 1208,

18   (1993) (emphasis in original).  The California Supreme Court has construed Section 654 to allow

19   multiple punishments for "simultaneous yet separate" physical acts, explaining that "simultaneous

20   possession of different items of contraband are separate acts for these purposes."  *See People v.*

21   *Jones*, 54 Cal. 4th 350, 358 (2012) (internal quotation marks and citation omitted).  Here,

22   Petitioner was sentenced to separate counts for possession of heroin, cocaine and

23   methamphetamine.  As noted above, Petitioner received separate text messages seeking to

24   purchase specific types of drugs.  Because California law has authorized multiple punishments

25   where the intent and objective are divisible, and has specifically found the simultaneous

26   possession of different forms of contraband to constitute separate acts under California law, there

27   was no violation of the Double Jeopardy Clause.  *See Missouri v. Hunter*, 459 U.S. 359, 368-69

28   (1983) (holding that the Double Jeopardy Clause does not prohibit cumulative punishments that

have been specifically authorized by a state legislature.)  Petitioner's double jeopardy claim is

DENIED.

### III.    CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is **DENIED**.

A certificate of appealability will not issue because reasonable jurists would not "find the

district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*,

529 U.S. 473, 484 (2000).  Petitioner may seek a certificate of appealability from the United States

Court of Appeals.

The Clerk shall enter judgment in favor of Respondent and close the file.

**IT IS SO ORDERED.**

Dated: August 25, 2021

HAYWOOD S. GILLIAM, JR.
United States District Judge